## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROBERT SMITH,

      Plaintiff,

vs.                                                                    Civ. No. 20-1321 KK/JFR

DENIS MCDONOUGH, Secretary of
U.S. Department of Veterans Affairs,[1]

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Summary-Judgment Motion (Opposed) (Doc. 85) ("Motion"), filed August 18, 2023. The Court, having considered the parties' submissions, the record, and the relevant law, FINDS that the Motion is well-taken in part and should be GRANTED IN PART. Additionally, on the present record, the Court is inclined to grant summary judgment in Defendant's favor on the claims not disposed of by this Memorandum Opinion and Order, on grounds Defendant did not raise in his Motion. However, the Court will permit both parties to submit supplemental briefing before it decides whether to grant Defendant summary judgment on Plaintiff's remaining claims.

## I. Procedural and Factual Background

Plaintiff Robert Smith filed this action on December 18, 2020, claiming that his employer, the United States Department of Veterans Affairs ("VA"), discriminated against him based on his race, color, age, opposition to discriminatory practices, and participation in Equal Employment Opportunity ("EEO") proceedings, in violation of Title VII of the Civil Rights Act of 1964 ("Title

---

[1] Defendant McDonough has been automatically substituted for former VA Secretary Robert Wilkie pursuant to Federal Rule of Civil Procedure 25(d).

VII") and the Age Discrimination in Employment Act ("ADEA"). (Doc. 2.) On March 11, 2022, Plaintiff filed a Second Amended Complaint for Employment Discrimination on the Basis of Race, Color, Age and Retaliation ("SAC"), in which he indicates that he bases his claims on the alleged actions of his supervisor, Jerome Nutter. (Doc. 45.) Defendant filed the Motion presently before the Court on August 18, 2023, seeking summary judgment on all of the claims raised in the SAC. (Doc. 85.)

Before setting forth the material facts that bear on the issues in this case, the Court addresses Plaintiff's *pro se* response to Defendant's Motion (Doc. 90) ("Response"),[2] which fails to conform to Local Civil Rule 56's requirement that such responses "contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist." D.N.M.LR-Civ. 56.1(b). Plaintiff's Response makes various statements of "Material Fact" that purport to controvert statements of material fact in Defendant's Motion. (*See, e.g.*, Doc. 90 at 1-2 ¶ 3.) However, it largely fails to address Defendant's material facts directly and includes arguments and allegations that are unclear. (*See generally id.*) Moreover, although Plaintiff at times refers to the exhibits attached to his Response, he frequently fails to cite to the record evidence on which he relies, again contrary to Local Civil Rule 56. *See* D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute … must refer with particularity to those portions of the record upon which the non-movant relies[.]").

Courts generally grant *pro se* parties somewhat wider latitude in their filings than parties represented by counsel, making "some allowances for the pro se plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction,

---

[2] Plaintiff captioned his Response as a "Motion Opposing Default Judgment." (Doc. 90 at 1.)

or his unfamiliarity with pleading requirements[.]" *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quotation marks and brackets omitted). Nevertheless, "the [C]ourt cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id*. Thus, although Plaintiff's Response fails to conform to Local Civil Rule 56 and is often difficult to follow, the Court has tried to ascertain any points as to which Plaintiff has raised a genuine issue of material fact. However, the Court must deem as undisputed any properly supported factual assertions in Defendant's Motion that Plaintiff wholly fails to address in his Response. *See* D.N.M.LR-Civ. 56.1(b) (material facts set forth in summary judgment motion "will be deemed undisputed unless specifically controverted").

Plaintiff Robert Smith is a Black African American born in 1957. (Doc. 45 at 2 ¶ 8; Doc. 46 at 2 ¶ 8; Doc. 85-1 at 25.) He has a bachelor's degree in computer science and has worked as a GS-13 Information and Technology ("IT") supervisor at the VA hospital in Albuquerque, New Mexico, since 2010. (Doc. 85-1 at 3-5.) Frank Martinez, who is Hispanic and younger than Plaintiff, is also a GS-13 IT supervisor at the VA hospital in Albuquerque. (Doc. 85 at 2; Doc. 85-1 at 5.) Jerome Nutter, a Caucasian born in 1956, has directly supervised Plaintiff since 2010 and directly supervises Mr. Martinez as well. (Doc. 85-1 at 4-5, 25; Doc. 85-2 at 2 ¶¶ 1-2.)

In his SAC, Plaintiff alleges that Mr. Nutter subjected him to a hostile work environment after he filed an initial EEO complaint in March 2019 and a supplemental complaint in "October and November of 2019." (Doc. 45 at 2-3 ¶¶ 10-11.) In his answer, Defendant admits that "Plaintiff filed an EEO complaint on March 2, 2019" and that "Plaintiff's EEO complaint was amended on October 11, 2019[.]" (Doc. 46 at 2 ¶ 10.) Plaintiff points to no record evidence tending to show that he filed a supplemental EEO complaint in November 2019. (*See generally* Doc. 90.)

3

In the SAC, Plaintiff alleges that the hostile work environment to which he was subjected consisted of: (A) "being criticized for his performance" and "demeaned and humiliated," unlike Mr. Martinez; (B) "being subjected to a heavy work load" compared to Mr. Martinez; (C) "being downgraded in annual performance evaluation[s]," unlike Mr. Martinez; (D) "being blamed for failed projects" to which Mr. Martinez was assigned[3]; (E) "being left out of important daily meetings or emails" in which Mr. Martinez was included, "making it difficult [for Plaintiff] to perform his duties"; (F) "being harassed about not closing two tickets," while Mr. Martinez "was not harassed" for "numerous unclosed tickets"; (G) "being prevented from receiving training" while Mr. Martinez was given "opportunities to receive the same or similar training"; and, (H) having his "supervisor duties" revoked, while Mr. Martinez's "same duties" were not.[4] (Doc. 45 at 3-5 ¶ 12.) Plaintiff also alleges that Mr. Nutter's interactions with him were "more aggressive in tone and manner than with Mr. Martinez." (*Id.* at 5 ¶ 13.) Plaintiff claims that Mr. Nutter subjected him to this hostile work environment because of his race, color, age, and protected opposition to workplace discrimination. (*Id.* at 5-7 ¶¶ 16-31.)

Below, the Court sets forth the record evidence regarding each of these alleged employment actions.

---

[3] In the SAC, Plaintiff also alleges that he was downgraded in annual performance evaluations while Mr. Martinez's 39-year-old Hispanic subordinate was not, and that he was blamed for failed projects assigned to this subordinate. (Doc. 45 at 3-4 ¶ 12(C), (D).) However, in light of the undisputed fact that Plaintiff and Mr. Martinez are both GS-13 IT supervisors who report directly to Mr. Nutter, a subordinate of Mr. Martinez is plainly not similarly situated to Plaintiff, and thus the allegations that this individual was treated differently than Plaintiff do not support an inference of discriminatory motive as a matter of law. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017).

[4] In the SAC, Plaintiff also describes the categories of conduct he challenged in his March 2019 EEO complaint. (Doc. 45 at 2-3 ¶ 10.) Although the Court has not used these categories to structure its analysis, it has considered the employment actions to which the categories allude to the extent there is record evidence to support them.

4

(A) Criticism and Demeaning and Humiliating Conduct[5]

With respect to this alleged employment action, the deposition excerpts attached to Defendant's Motion include Plaintiff's testimony that, on unspecified dates, Mr. Nutter called Plaintiff a "liar," "damn liar," "motherf*cker," and "son of a b*tch," and said that Plaintiff's degree "isn't worth the paper that it was written on," that Plaintiff should "retire so they could be happy," that if Plaintiff was "not looking for a job [he] should be" because none of his employees liked him, and, on no more than five occasions, that Mr. Nutter did not want to hear what Plaintiff had done.[6] (Doc. 85-1 at 12-13, 15-16, 22.) In addition, Plaintiff testified that Mr. Nutter once said Plaintiff did not "have any damn leadership qualities" because he gave his subordinates directions, but then two weeks later Mr. Nutter criticized Plaintiff for not giving such directions. (*Id.* at 8-11.) Also, according to Plaintiff's testimony, when Mr. Nutter promoted Plaintiff to IT supervisor and Plaintiff "asked for help," Mr. Nutter "just laughed." (*Id.* at 16.)

Plaintiff testified that he did not know why Mr. Nutter insulted him in these ways. (*Id.* at 13.) He testified to his belief that Mr. Nutter "stereotyped [Plaintiff] where he call[ed Plaintiff] son of a b*tch and motherf*cker and things like that[.]" (*Id.* at 12-13.) Explaining this belief, he stated that Mr. Nutter was "married to a [B]lack woman," told "stories about being in Chicago" and "hang[ing] out with [B]lack people," and "used to use a lot of profanity," and "so [Plaintiff] got the impression [Mr. Nutter] assumed that [Plaintiff] was like the people that maybe he had came

---

[5] Plaintiff's allegations of being demeaned and humiliated appear in paragraph 12(E) of the SAC, which principally concerns Plaintiff's allegations of being left out of meetings and e-mails. (Doc. 45 at 4.) Because being "criticized" and "demeaned and humiliated" appear to overlap, the Court will address the evidentiary support for these allegations together.

[6] Mr. Nutter, conversely, has denied under penalty of perjury that he ever called Plaintiff a "liar," "damn liar," "motherf*cker," or "son of a b*tch," or told Plaintiff he did not "have any damn leadership qualities," his degree was not "worth the paper that it was written on," or he should "retire so they can be happy." (Doc. 85-2 at 2 ¶ 3.) In other words, there are genuine factual disputes regarding whether Mr. Nutter said these things.

in contact with" in Chicago. (*Id.* at 13.) However, Plaintiff admitted that he did not know "the type of people" Mr. Nutter was visiting in Chicago, except that they were Black. (*Id.*) Plaintiff also admitted that Mr. Nutter stopped calling him profane names when Plaintiff asked him to. (*Id.*)

Plaintiff testified that he never heard Mr. Nutter talk to Mr. Martinez "that way" and he never heard Mr. Nutter call anyone else "motherf*cker" or "son of a b*tch or anything like that." (*Id.* at 13-14.) However, Plaintiff also admitted that Mr. Nutter only called him these names when he was in Mr. Nutter's office and no one else was present, and he did not know if Mr. Nutter had called other people "names like that" when he was not present. (*Id.* at 14.) Plaintiff further admitted that Mr. Nutter never used any racial slurs against him and never commented that he was old, feeble, or decrepit, nor did Mr. Nutter say he was too old to do a job or task. (*Id.* at 23.)

<u>(B) Heavy Workload</u>

With respect to this alleged employment action, Plaintiff testified that in 2017, Mr. Nutter pulled Mr. Martinez off of the Refresh project, on which both Plaintiff and Mr. Martinez had been working. (*Id.* at 18.) According to Plaintiff, he "sometimes … had to spend hours after hours" to complete this project. (*Id.* at 20.) Plaintiff added that, after he "had to chase [Mr.] Nutter down the hall" to get Mr. Nutter to sign his overtime pay request, and Mr. Nutter "made it seem like he was doing [Plaintiff] a favor" by signing the request, Plaintiff stopped requesting overtime pay because it was "too much of a hassle." (*Id.* at 20.)

Plaintiff further testified that in or about December 2019, Mr. Nutter pulled Mr. Martinez off of the Vocera project and gave it to Plaintiff. (*Id.* at 16-18.) According to Plaintiff, after Mr. Martinez was pulled off of the Vocera project, Plaintiff took "maybe five days" to complete the project while also working on his other tasks. (*Id.* at 17.) Additionally, Plaintiff testified that Mr. Nutter assigned him the Authority to Operate project after it was "already behind." (*Id.* at 19, 33.)

More broadly, Plaintiff testified that "every time [he] go[es] into the office … [he] walked out of [Mr. Nutter's] office assigned another task." (*Id.* at 19.)

Plaintiff admitted that he never told Mr. Nutter his workload was too heavy, and that he did not know what tasks Mr. Nutter assigned to Mr. Martinez. (*Id.* at 20-21.) Mr. Nutter, in turn, declared under penalty of perjury that he assigned and reassigned projects to Plaintiff and other employees based solely on "the needs of each individual project and [his] employees' skills and availability," and never based on race, age, or EEO participation. (Doc. 85-2 at 3 ¶ 4.)

<u>(C) Performance Evaluation Downgrades</u>

It is undisputed that Mr. Nutter downgraded Plaintiff's rating from "Outstanding" to "Excellent" in annual performance evaluations from 2019 to 2022. (Doc. 85 at 6; Doc. 85-1 at 23-24; Doc. 90 at 1-2 ¶ 3; Doc. 90-4 at 2-9.) Further, Plaintiff has presented evidence that these downgrades caused him to receive lower "share amounts" than he would have received had Mr. Nutter continued to give him "Outstanding" ratings. (Doc. 90-2 at 2-3, 6-7, 9-11.) Specifically, Plaintiff attached to his Response e-mails from the VA Office of Information and Technology indicating that, among other things, GS-13 employees rated "Outstanding" would receive $1,000 share amounts, while GS-13 employees rated "Excellent" would receive $500 share amounts, for the years 2019, 2020, and 2021.[7] (Doc. 90-2 at 3, 6-7, 10.)

In his Declaration, Mr. Nutter attested that he downgraded Plaintiff's ratings because of his work performance and not because of race, age, or EEO participation. (Doc 85-2 at 3 ¶ 5.)

---

[7] Alternatively, employees could opt to receive time off, with those rated "Outstanding" eligible to receive more time off than those rated "Excellent." (Doc. 90-2 at 3, 7-8, 10-11.) Employees rated "Outstanding" could also opt to receive a "quality step increase" in lieu of a share amount or time off. (*Id.* at 3, 7-8, 11.)

According to Mr. Nutter, these issues included Plaintiff's refusal to participate in an interview panel in 2019 and his conduct during the Canteen project in early 2020. (*Id.*; *see* Part I.D., *infra*.)[8]

Plaintiff admitted that he refused to participate in an interview panel in May 2019, testifying that he did so because he "didn't want to participate in something that was already predetermined." (Doc. 85-1 at 24.) Plaintiff also admitted that Mr. Nutter sent him an e-mail denying his request to be excluded from the interview, stating that Plaintiff's job duties included "HR Management functions," and warning Plaintiff that if he chose not to participate or participated less than fully, his "end of year performance rating could be [a]ffected." (*Id.* at 24-25; Doc. 90-1 at 2.) However, Plaintiff testified that this "wasn't the explanation [Mr. Nutter] gave [him] at the end of year. This never came up at the end of the year." (Doc. 85-1 at 25.) According to Plaintiff's testimony, he did not know the reason for the 2019 downgrade but believed it was because Mr. Nutter "was biased toward [him]" because of his race. (*Id.*)

Plaintiff attached his 2019 performance evaluation to his Response. (Doc. 90-4 at 2-9.) Mr. Nutter signed this evaluation on December 18, 2019. (*Id.* at 9.) In it, Mr. Nutter rated Plaintiff as "Exceptional" in the category of "HR/Workforce Management," and as less than exceptional in the categories of "Supervisory Development & Technical Training" and "Customer Service." (*Id.* at 7.)

---

[8] Defendant attached to his reply an excerpt from Plaintiff's deposition in which Plaintiff testified to the effect that the Canteen project impacted his 2020 performance review. (Doc 93-1 at 3.) Defendant did not cite to this excerpt in, or attach the excerpt to, his Motion. (*See generally* Doc. 85, Doc. 85-1.) In this circumstance, the Court has "two permissible courses of action. It [can] either … [permit] a surreply or, in granting summary judgment for the movant, … [refrain] from relying on any new material contained in the reply brief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164-65 (10th Cir. 1998). As the analysis below shows, the Court has opted to refrain from relying on the new material attached to the reply in granting Defendant summary judgment on Plaintiff's race and age discrimination claims. (*See* Part II.B, *infra*.) Moreover, the new material is irrelevant to the Court's analysis of Plaintiff's retaliation claims. (*See* Part II.C, *infra*.)

Plaintiff testified that at some point he met with Mr. Nutter about his 2020 performance evaluation, and Mr. Nutter told him that his rating had been downgraded because he "wasn't a team player." (Doc. 85-1 at 24.) According to Plaintiff, when he asked Mr. Nutter to elaborate, Mr. Nutter referred to "'the Canteen project,' and that was pretty much his explanation." (*Id.*)

Plaintiff admitted that he did not know Mr. Martinez's 2019 rating, and though he testified that he saw Mr. Martinez's 2020 rating by mistake, the record does not include his testimony as to what that rating was. (*Id.* at 25.) However, Plaintiff attached to his Response what appears to be a spreadsheet indicating ratings for, *inter alia*, himself and Mr. Martinez as of the pay period "20-19," showing that both were rated as "Excellent." (Doc. 90-2 at 5.)

(D) Blamed for Failed Projects

In his deposition testimony, Plaintiff indicated that this alleged employment action concerned the Canteen project, which involved upgrading cafeteria registers at the VA hospital in February 2020.[9] (Doc. 85-1 at 26-32.) According to Plaintiff, one of his subordinates, Ramon Sanchez, had volunteered to work on the project, but Mr. Martinez did not get back to Mr. Sanchez, so on the first day of the project, Plaintiff assigned Mr. Sanchez to work on a ticket in Santa Fe instead. (*Id.* at 27, 30.) Plaintiff testified that neither he nor Mr. Sanchez knew that Mr. Sanchez was supposed to be on the project. (*Id.*) Then, Plaintiff explained, another of Plaintiff's subordinates, Jamison Castillo, took it upon himself to go work on the project without Plaintiff's knowledge, and Plaintiff "thought he just disappeared," so Plaintiff sent for him to come back to the office. (*Id.* at 28-31.) Plaintiff testified that Mr. Nutter subsequently admonished him that he

---

[9] At his deposition, Plaintiff conceded that this project was completed in a timely and successful manner. (Doc. 85-1 at 27.) It is therefore unclear why he alleges that the project failed.

should have communicated with Mr. Nutter before pulling anyone off of the project and told Plaintiff that he had put Mr. Nutter's service mission at risk. (*Id.* at 27, 29.)

According to Plaintiff, Mr. Martinez should have told Mr. Sanchez whether he was needed for the project. (*Id.* at 32.) Plaintiff admitted that he did not know whether Mr. Nutter counseled Mr. Martinez about the project's staffing difficulties. (*Id.*) In Mr. Nutter's September 2020 EEO affidavit attached to Plaintiff's Response, Mr. Nutter attested that "Mr. Martinez wasn't even involved in the project." (Doc. 90-3 at 4.) However, also attached to Plaintiff's Response is a document showing that Mr. Martinez requested overtime pay for "Canteen POS update and hardware upgrade," and that the request was approved.[10] (Doc. 90-7; *see also* Doc. 85-1 at 32.)

### (E) Left Out of Meetings and E-mails

With respect to his allegation that he was left out of meetings, Plaintiff testified that he was left out of a planning session for the Golden Age Games project that Mr. Nutter and Mr. Martinez attended, and that he thereafter "refused to be part of the project" because "all of the decisions ha[d] already been made" and they wanted him "to be the grunt guy to make sure that everything went off as planned." (Doc. 85-1 at 33.)

Plaintiff also testified to a meeting between Mr. Nutter, Mr. Martinez, and Josh Paulson, at which these individuals made a decision about "replacing one of [Plaintiff's] guys with one of the guys that were in inventory … without [Plaintiff] being there." (*Id.*) More generally, Plaintiff

---

[10] In his reply, Defendant "objects" to Plaintiff's use of this and other exhibits, which he argues are "unauthenticated documents … that were not produced during discovery[.]" (Doc. 93 at 2-4.) In briefing on a motion for summary judgment, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, Defendant appears to request different relief, *i.e.*, a sanction under Federal Rule of Civil Procedure 37. Since a party must make this request by motion, the Court will consider these exhibits notwithstanding Defendant's objection. *See* Fed. R. Civ. P. 37(a)(3), (d).

testified that he was "rarely a part of any … meetings" and "usually … f[ound] out after the fact," and that this happened "numerous" times, though he "can't quantify the numbers." (*Id.*)

Regarding his allegation that he was left out of e-mails, Plaintiff attached to his Response an e-mail chain dated August 22, 2023, about a "Saturday IT Outage." (Doc. 90-9 at 2-3.) The original e-mail was sent from New Mexico VA Health Care System Executive Director Robert McKenrick to "VHA V22 ABQ ELT," copied to Mr. Nutter and "ABQ Director's Support," at 3:17 p.m., and requested a short briefing on the planned one-hour outage. (*Id.* at 3.) At 3:20 p.m., Mr. McKenrick forwarded the e-mail to Plaintiff, copied to New Mexico VAHCS Associate Director Sonja Brown, "per Mr. Nutter's out of office reply." (*Id.* at 2.) Plaintiff responded that he would "gather all the facts and be more than happy to brief."[11] (*Id.*)

Mr. Nutter, in turn, declared that he only considered a specific project's needs, and never employees' race, age, or EEO participation, when scheduling meetings and sending e-mails.[12] (Doc. 85 at 8; *see* Doc. 85-2 at 3-4 ¶ 7.)

---

[11] In his reply, Defendant argues that the Court should not consider this 2023 incident in its analysis of Defendant's Motion because Plaintiff's SAC "alleges discrimination occurring only in '2019'" and because "there is a no record evidence that [Plaintiff] exhausted administrative remedies" for this incident. (Doc. 93 at 3.) Defendant is correct that, to the extent being left out of the e-mail chain in 2023 is alleged to be an actionable violation of Title VII or the ADEA on its own, Plaintiff must exhaust administrative remedies before bringing a claim in federal court. *See Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003). However, a "hostile work environment … may include acts taking place after [a] plaintiff files an EEOC charge if those acts contribute to the same hostile work environment that existed during the filing period." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005). Thus, Defendant's argument fails to the extent Plaintiff relies on this incident to support his hostile work environment claims. Furthermore, Defendant raised this argument for the first time in his reply, and the Court will therefore refrain from relying on it to the extent Plaintiff asserts disparate treatment claims based on the incident. *See Beaird*, 145 F.3d at 1164-65.

[12] In his Response, Plaintiff also cites to a May 2019 memorandum he addressed to Mr. Nutter, in which he described, among other things, an alleged April 2019 incident in which Mr. Nutter did not invite him to a meeting attended by Mr. Martinez about equipment that Mr. Nutter later asked Plaintiff to order. (Doc. 90 at 4 ¶ 7; Doc. 90-8 at 15-16.) Plaintiff further cites to a memorandum he addressed to "Under Secretary Kurt DelBene," in which he discussed, among other things, the August 2023 incident in which Mr. Nutter allegedly left him off of the e-mail chain about the planned one-hour outage. (Doc. 90 at 5 ¶ 7; Doc. 90-10 at 12.) However, these memoranda are neither sworn nor declared to be true under penalty of perjury. (Docs. 90-8, 90-10.) As such, Plaintiff's factual allegations in the

(F) Harassed for Not Closing Tickets

With respect to this alleged employment action, Defendant admits that Mr. Nutter counseled Plaintiff about two service tickets that Plaintiff left open in the IT tracking system in August 2020. (Doc. 85 at 9.) Mr. Nutter declared that he counseled Plaintiff, not because of Plaintiff's race, age, or EEO participation, but because Mr. Nutter's job requires him "to ensure that [his] employees complete their required tasks." (Doc 85-2 at 4 ¶ 8.) Mr. Nutter further declared that when Mr. Martinez has left tickets open, he has "counseled [Mr. Martinez] … in the same manner that [he has] counseled [Plaintiff]." (*Id.*)

Regarding this issue, Plaintiff testified that, in August 2020, Mr. Nutter sent him a Microsoft Teams message stating that Mr. Nutter had had to close two of Plaintiff's tickets. (Doc. 85-1 at 34.) Plaintiff also testified that he complained to Mr. Nutter about Mr. Martinez "leaving his tickets in the queue," whereupon Mr. Nutter "decided to make [Plaintiff] go back. He said, I want you to go back and close out all these tickets, they've got to be closed." (*Id.*) According to Plaintiff,

> [t]here was no need to close them but I went back and closed them out because that's what he told me to do. But when I looked, [Mr. Martinez] didn't close his out, and there was, as far as I know there was nothing said to him about it because they remained[.]

(*Id.*; *see also id.* ("And if something is said to [Mr. Martinez], obviously, he must ignore them because the ticket never gets processed.").)

---

memoranda are not competent evidence to prove the alleged incidents in question. *See, e.g., Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015) ("Although a formal affidavit is no longer required, [Federal] Rule [of Civil Procedure] 56(c)(4) still requires that a written unsworn declaration, certificate, verification, or statement be subscribed in proper form as true under penalty of perjury under 28 U.S.C. § 1746 to substitute for an affidavit.") (quotation marks and brackets omitted). Rather, at most, the cited memoranda could be used to show what Plaintiff told Mr. Nutter and Mr. DelBene, which is not at issue in the present Motion.

Additionally, Plaintiff attached to his Response a spreadsheet entitled "Provisioning ABQ Tickets > 1 Day Unassigned from 01012020 to 01012021." (Doc. 90-11.) This spreadsheet appears to show select ticketing activity by Mr. Martinez, Mr. Nutter, and Plaintiff in 2020. (*Id.*) However, Plaintiff does not include in his Response any explanation as to the provenance of the data included on the spreadsheet, nor is the provenance apparent.[13] (*See* Doc. 90 at 6-7 ¶ 10.)

<u>(G) Prevented from Receiving Training</u>

With respect to this alleged employment action, Plaintiff testified that he was unable to attend a previously assigned training because, although travel funding was approved, Mr. Nutter told him there was no funding to pay for the cost of the training itself. (Doc. 85-1 at 35-37.) Plaintiff added that Mr. Nutter did not assign him alternative training as promised. (*Id.* at 35-36.) Plaintiff further testified that Mr. Nutter "may have" said in an e-mail that "funding for travel was not authorized for non-emergency travel due to the COVID-19 pandemic," and that he did not know what training opportunities Mr. Martinez received. (*Id.*)

Mr. Nutter, in turn, declared that "government restrictions on nonessential travel stemming from the Covid-19 pandemic prevented [Plaintiff] from attending the training that he alludes to." (Doc. 85-2 at 4 ¶ 9.)

---

[13] The spreadsheet contains a legend indicating that green rows show "Metric met due to weekend/holiday" and red rows show "exceeded 24-hour assignment Metric." (Doc. 90-11 at 6.) The spreadsheet includes columns for who was assigned a particular ticket number and who closed the ticket. (*See generally id.*) Of the 29 tickets designated as assigned to Mr. Martinez, 19 appear in red and 10 appear in green. (*Id.* at 1-2.) Of the six tickets designated as assigned to Plaintiff, four appear in green and two appear in white (*Id.* at 6.) The two white rows contain notes in an "Additional Notes" column stating, "Customer Requested my assistance," "Frank Martinez," and "Frank Month of Responsibility." (*Id.*) "Frank Month of Responsibility" is an apparent reference to a fact to which Plaintiff testified, namely that he and Mr. Martinez manage the ticketing system in alternating months. (*See* 85-1 at 34.) In his unsworn memorandum to Mr. DelBene, Plaintiff appears to have discussed this spreadsheet, which he described as a "report," but again, he did not indicate the provenance of the data in it. (Doc. 90-10 at 10-11.)

(H) Revoked Supervisor Duties

With respect to this alleged employment action, Defendant attached to his Motion a June 2020 memo in which Mr. Nutter instructed Plaintiff and Mr. Martinez that "[a]ll written correspondence issued to employees from supervisors must have [Mr. Nutter's] concurrence on it."[14] (Doc. 85-3.) According to Plaintiff, Mr. Nutter sent this memo because, in March 2020, Plaintiff verbally reprimanded a subordinate employee in front of other employees and issued an "expectation memo" in which he warned the employee he could be terminated for failure to comply with the expectations in the memo. (Doc 85-1 at 37-38.) Plaintiff testified that Mr. Nutter "took issue with" the expectation memo and told him that calling the employee out in front of other employees was "not cool." (*Id.*) Plaintiff further testified that Mr. Nutter instructed him not to "issue any expectations to any of [his] employees in writing or verbally," and that Plaintiff asked Mr. Nutter to put these instructions in writing. (*Id.* at 38-39.) Plaintiff also attached to his Response a May 10, 2020, e-mail from himself to Mr. Nutter in which he claimed that he had not yet received the instructions in writing and was therefore asking for them again. (Doc. 90-6 at 2.) According to Plaintiff, after Mr. Nutter gave his verbal instructions in March and before he issued his memo modifying those instructions in June, Plaintiff was "afraid to talk to [his] employees or tell them what [he] expect[ed]." (Doc. 85-1 at 39.)

Plaintiff testified that Mr. Martinez did not do what he did "as far as trying to make sure the employees do their job, issue expectation letters to the employees." (*Id.*) Rather, according to Plaintiff, Mr. Martinez stayed in his office "the majority of the time" and Plaintiff was "the one … usually going out and helping the employees." (*Id.*) As such, Plaintiff testified to his belief that the

---

[14] In his declaration, Mr. Nutter attested that the memo attached to Defendant's Motion "is a true and correct copy of the memorandum that [he] issued to both [Plaintiff] and Mr. Martinez on June 10, 2020." (Doc. 85-2 at 4 ¶ 10.)

June 2020 memo, though addressed to both him and Mr. Martinez, "was strictly meant for [Plaintiff]." (*Id.*)

Mr. Nutter, in turn, declared that he issued the June 2020 memo to Plaintiff and Mr. Martinez, not because of Plaintiff's race, age, or EEO participation, but "to ensure uniformity among supervisors when employees are counseled about their behavior in writing." (Doc. 85-2 at 4-5 ¶ 10.)

## II. <u>Analysis</u>

### A. Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); *see* Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence" that demonstrate a genuine dispute as to material facts. *Id.* at 671 (quotation marks omitted); *see MacKenzie*, 414 F.3d at 1273 ("Unsupported conclusory allegations ... do not create

15

an issue of fact."). If the nonmovant can demonstrate a "genuine dispute" as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court "may not grant summary judgment based on its own perception that one witness is more credible than another[.]" *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017). However, "where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is not one of credibility, but rather the absence of evidence creating a triable issue of fact." *Id.* In other words, the nonmoving party "must do more than merely assert that the jury might disbelieve the testimony" presented by the moving party. *Id.* (quotation marks omitted). Rather, "[he] must present [his] own affirmative evidence" to contradict the testimony. *Id.* (brackets omitted); *see also Nat'l Am. Ins. Co. v. Am. Re–Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").

### B. Plaintiff's Discrimination Claims

In his SAC, Plaintiff asserts three counts of discrimination: race and color[15] discrimination in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, and age discrimination in violation of the

---

[15] Title VII "does not define 'color,'" but "[t]he courts and the [EEOC] read 'color' to have its commonly understood meaning - pigmentation, complexion, or skin shade or tone. Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person. Even though race and color clearly overlap, they are not synonymous." EEOC Compliance Manual, § 15-III, "What Is 'Color' Discrimination?," https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#III (last accessed Mar. 22, 2024). Plaintiff does not appear to make any allegations of color discrimination that are distinct from his race

ADEA, 29 U.S.C. §§ 621, *et seq*. (Doc. 45 at 5-7 ¶¶ 16-31.) The SAC includes allegations that Plaintiff's supervisor subjected him to a hostile work environment, and also that his supervisor committed discrete acts constituting unlawful disparate treatment. (*See id.* at 3-5 ¶¶ 12-13.) The Court considers whether Plaintiff's claims survive the present Motion for summary judgment under both theories of discrimination.

To prove unlawful discrimination under Title VII or the ADEA, a plaintiff lacking direct evidence of race or age discrimination may prove such discrimination by using the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972). *See, e.g., Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (applying the *McDonnell Douglas* framework to ADEA claims). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). If the plaintiff can do so, "the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its actions." *Id.* If the employer can do so, "the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.*

1. Disparate Treatment

A plaintiff proves a disparate treatment claim under Title VII or the ADEA by showing that his employer treated him less favorably because of a protected characteristic such as race or age. 29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e–2; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–986 (1988); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993). As noted above, a

---

discrimination claims. Also, at his deposition, Plaintiff confirmed that the bases for his claims are "age, race, and retaliation." (Doc. 85-1 at 8.) As such, the Court will analyze Plaintiff's discrimination claims based on race and color as race discrimination claims.

plaintiff lacking direct evidence of race or age discrimination may prove such discrimination by using the *McDonnell Douglas* burden-shifting framework. To prove a disparate treatment claim under this framework, the plaintiff must first establish a prima facie case of discrimination by showing "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Daniels*, 701 F.3d at 627.

The Tenth Circuit defines the phrase "adverse employment action" liberally, taking a "case-by-case approach[ that examines] the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (quotation marks omitted). However, as Defendant observes, (Doc. 85 at 11-12), the Tenth Circuit does not deem "a mere inconvenience or an alteration of job responsibilities to be an adverse employment action[.]" *Jones*, 617 F.3d at 1279. "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions" could give rise to a discrimination suit. *Robinson v. Cavalry Portfolio Servs., LLC*, 365 F. App'x 104, 114 (10th Cir. 2010).[16] Rather, to be actionable, a challenged action must constitute a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits[.]" *Daniels*, 701 F.3d at 635 (emphases omitted).

A plaintiff may establish that an adverse action took place under circumstances giving rise to an inference of discrimination by showing that preferential treatment was given to "similarly situated" employees outside the plaintiff's protected class. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005); *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir.

---

[16] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

2002). "An employee is similarly situated to the plaintiff if the employee shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017). In addition, "even employees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant*." McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quotation marks omitted).

Initially, as a matter of law, several of Plaintiff's disparate treatment claims fail because Plaintiff has not shown a genuine factual dispute regarding the second element of his prima facie case, *i.e.*, adverse employment action. *Daniels*, 701 F.3d at 627, 635. Specifically, Plaintiff has failed to show a genuine factual dispute as to whether his being criticized, demeaned, humiliated, and counseled about closing tickets amount to "*significant* change[s] in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits." *Id.* at 635 (emphases in original); *see, e.g.*, *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 605 (10th Cir. 2019) (holding that humiliation upon being escorted from workplace did not constitute adverse employment action); *Semsroth v. City of Wichita*, 304 F. App'x 707, 717, 719 (10th Cir. 2008) (holding that oral reprimand did not constitute adverse employment action where plaintiff "presented no evidence that the reprimand affected her status").

Moreover, while excluding an employee from an important meeting or e-mail could conceivably constitute adverse employment action in some circumstances, the undisputed record evidence shows that no such circumstances are present here. Plaintiff points to no evidence that Mr. Nutter's actions excluding him from the two specific meetings about which he testified, and

the single e-mail chain attached to his Response, impacted him so greatly that any of these actions were comparable to a significant change in employment status, such as hiring, firing, failing to promote, or a significant change in job responsibilities or benefits. *Daniels*, 701 F.3d at 635; (*see generally* Doc. 90.) Nor is Plaintiff's vague and conclusory testimony that he was excluded from meetings "numerous" times, (Doc. 85-1 at 33), adequate to create a genuine factual dispute on this point. On the contrary, at most, Plaintiff's testimony shows that these actions were "a mere inconvenience or alteration of job responsibilities." *Sanchez*, 164 F.3d at 532 (holding that lateral transfer resulting in longer commute was mere inconvenience or alteration of job responsibilities that did not rise to level of adverse employment action).

Likewise, depriving an employee of training may constitute an adverse employment action if doing so significantly affects the employee's job status, compensation, or benefits. *Jones*, 617 F.3d at 1279. But here, there is no evidence to show that Plaintiff suffered any consequences at all due to missing the training at issue. *See Harper v. Arrow Elecs.*, 2021 WL 6071625, at *4 (10th Cir. Dec. 21, 2021) (holding that deprivation of firsthand training did not constitute adverse employment action where plaintiff did not explain how deprivation "resulted in any significant change in her employment status, compensation, or benefits"). Thus, as a matter of law, Plaintiff's being left out of meetings and e-mails and denied training do not rise to the level of adverse employment action as required to support a claim for disparate treatment discrimination under Title VII or the ADEA.

Conversely, Plaintiff *has* demonstrated a genuine issue of material fact regarding whether his downgraded performance evaluation ratings, including any downgrades due to his conduct during the Canteen project, amount to adverse employment action, by presenting evidence that the downgrades reduced his share amounts. *See, e.g., Glenn v. Am. Online, Inc.*, No. 04-cv-110, 2005

WL 8163552, at *7 (D.N.M. Aug. 3, 2005) (holding that corrective action resulting in reduction of plaintiff's stock allocation "tangibly and materially reduced the benefits of her employment and qualifies as an adverse employment action").

Furthermore, the Court assumes without deciding that there are genuine issues of material fact regarding whether Mr. Nutter's subjecting Plaintiff to a heavier workload, and revoking his supervisor duties from March to June 2020, constitute adverse employment actions. *See, e.g.*, *Jones v. Barnhart*, 349 F.3d 1260, 1269–70 (10th Cir. 2003) ("[A]n increased workload might constitute an adverse employment action in some circumstances[.]); *Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999) (alleged removal of job duties was actionable adverse employment action in First Amendment retaliation context); *but see Faragalla v. Douglas Cnty. Sch. Dist. RE 1*, 411 F. App'x 140, 155-56 (10th Cir. 2011) (affirming district court holding that educational assistant failed to show adverse employment action based on "excessive copying assignments," "a heavier caseload," and assignment to cafeteria cleaning).

However, as a matter of law, Plaintiff's disparate treatment claims based on these employment actions fail because Plaintiff has not shown a genuine factual dispute regarding the third element of his prima facie case, *i.e.*, that the actions took place under circumstances giving rise to an inference of discrimination. *Daniels*, 701 F.3d at 627. As to each of these actions, Plaintiff has identified Mr. Martinez as a younger, non-African American employee with the same job title, job description, and supervisor. However, Plaintiff has failed to show a genuine factual dispute regarding whether Mr. Nutter treated Mr. Martinez more favorably under similar circumstances.

First, regarding performance evaluation ratings, the only record evidence that appears to document Mr. Martinez's ratings shows that Plaintiff and Mr. Martinez received the same rating,

*i.e.*, "Excellent." (Doc. 90-2 at 5.) Second, regarding workloads, Plaintiff admitted that he did not know what tasks Mr. Nutter assigned to Mr. Martinez. *See Humbles v. Principi*, 141 F. App'x 709, 711–12 (10th Cir. 2005) ("Although an increased workload might constitute an adverse employment action in some circumstances, [plaintiff] failed to show his workload increased in relation to other employees[.]") (quotation marks and citation omitted). Thus, Plaintiff has failed to present any cognizable evidence that he and Mr. Martinez, though similarly situated, were treated differently with respect to their performance evaluation ratings or workloads. *Plotke*, 405 F.3d at 1101.

And third, regarding revoked supervisor duties, Plaintiff has pointed to no evidence that Mr. Martinez engaged in conduct comparably serious to reprimanding a subordinate in ways Mr. Nutter found to be inappropriate. Indeed, Plaintiff admitted that Mr. Martinez did not do what Plaintiff did "as far as trying to make sure the employees do their job, issue expectation letters to the employees." (Doc. 85-1 at 39.) Under these circumstances, even accepting as true that Mr. Nutter did not temporarily revoke Mr. Martinez's supervisor duties as he did Plaintiff's, this differential treatment is irrelevant. *McGowan*, 472 F.3d at 745. Plaintiff has therefore failed to show a genuine factual dispute regarding whether Mr. Nutter's downgrading of Plaintiff's performance evaluation ratings, assignment of a heavier workload to Plaintiff, or temporary revocation of Plaintiff's supervisor duties took place under circumstances giving rise to an inference of discrimination. *Daniels*, 701 F.3d at 627.

For all of the above reasons, Plaintiff has failed to show a genuine issue of material fact regarding whether he can establish a prima facie case of disparate treatment discrimination under the *McDonnell Douglas* framework. The Court will therefore grant Defendant summary judgment on Plaintiff's disparate treatment race and age discrimination claims.

2. Hostile Work Environment

*(a) Law on Hostile Work Environment*

"Hostile environment harassment occurs where a supervisor['s] … conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment." *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1269 (10th Cir. 1998). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, courts must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120.

"[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105; *see also Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) ("The entire range of related acts constitutes the hostile work environment[.]"). "In a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment," courts "must remain flexible" in determining what incidents constitute the same hostile work environment. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1229 (10th Cir. 2022). In general, however, courts consider whether the incidents in question involved "the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Morgan*, 536 U.S. at 120.

To establish a prima facie case of hostile work environment on a motion for summary judgment, a plaintiff must show that, under "the totality of the circumstances":  (1) the "workplace

23

is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"; and, (2) the plaintiff "was targeted for harassment because of" the plaintiff's protected characteristic.[17] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957, 959 (10th Cir. 2012); *see also Holmes v. Regents of Univ. of Colorado*, 176 F.3d 488, 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (unpublished).

Courts evaluate the pervasiveness and severity of alleged harassment by "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Title VII does not establish a general civility code[] for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) (quotation marks and citations omitted.) Likewise, "[n]ormal job stress does not constitute a hostile or abusive work environment," nor do "[p]ersonality conflicts between employees." *Trujillo v. Univ. of Colorado Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998).

While the Tenth Circuit has held that the "severity and pervasiveness evaluation of a hostile work environment claim is particularly unsuited for summary judgment because it is quintessentially a question of fact," *Hernandez*, 684 F.3d at 958 (brackets omitted), summary

---

[17] The Tenth Circuit has applied the *McDonnell Douglas* burden-shifting analysis to hostile work environment discrimination claims. *See, e.g., Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251, 1253 (10th Cir. 2021) (applying Title VII standards to plaintiff's hostile work environment claim under Title IX, and holding that its analysis of this claim "beg[an] and end[ed] at the first step in the *McDonnell Douglas* framework" due to plaintiff's inability to establish "each of the elements for a prima facie case" of hostile work environment discrimination); *see also Glapion v. Castro*, 646 F. App'x 668, 671 (10th Cir. 2016) (explaining the elements of a "prima facie case of hostile work environment").

judgment on these claims is nevertheless appropriate when the plaintiff's evidence is insufficient to create a factual dispute. *McElroy v. Am. Fam. Ins.*, 630 F. App'x 847, 850 (10th Cir. 2015). Thus, in *Trujillo*, the Tenth Circuit upheld a grant of summary judgment to an employer on the plaintiff's hostile work environment claims, holding that the plaintiff's evidence of numerous work difficulties did not create a genuine issue of material fact on the issue of severity or pervasiveness. *Trujillo*, 157 F.3d at 1213-15. Among other things, these difficulties included that his supervisor "documented improprieties" in his job performance, criticized and checked on his work, sent him memos requesting leave forms when he was absent, and placed a corrective action in his personnel file, and that he was impeded in his efforts to obtain building space to operate a program, not approved to attend a leadership program, not chosen to represent his employer at a dinner, locked out of a copy machine for a day, required to bring a final budget to a meeting, and excluded from part of the budgeting process for a program. *Id.* at 1213. Notwithstanding the numerosity of his complaints, the *Trujillo* court observed that the plaintiff fell "short of making a showing of pervasive or severe harassment" because he "was not subjected to anything that was physically threatening or humiliating, nor was he subjected to any offensive utterances," and his "list of grievances include[ed] none of the racial comment or ridicule that are hallmarks of hostile work environment claims." *Id.* at 1214; *see also Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017) (rejecting hostile work environment claim based on evidence that plaintiff struggled under heavy workload, received no relief when he asked for help, and was belittled, berated, and disciplined by his supervisors); *Gonzalez v. MRC Glob. (US) Inc.*, No. 18-cv-858, 2019 WL 4040605, at *5-7 (D.N.M. Aug. 27, 2019) (rejecting hostile work environment claims based on evidence that supervisor denied plaintiff's requests for a raise, picked favorites other than

her, did not support her choice to discipline other employees, ignored her e-mails, and at times did not greet her or shake her hand).

As noted above, to prove a prima facie case of hostile work environment discrimination, the plaintiff must show not only severe or pervasive harassment, but also that his protected characteristic was a "motivating factor" for the harassment. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021). To make this showing, the plaintiff may of course point to acts of harassment that are facially based on the protected characteristic. *Id.* The plaintiff may also rely on ambiguous conduct if the context allows for the inference that it was motivated by discriminatory animus. *See Faragalla*, 411 F. App'x at 152-53 (holding that remark that Egyptian plaintiff should "go home," without further evidence of context in which remark was made, was insufficient to create genuine issue of fact as to whether remark was motivated by discriminatory animus).

Finally, the Tenth Circuit has "long held that facially neutral abusive conduct can support a finding of racial [or age-based] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially[ or age-based] discriminatory conduct." *Hernandez*, 684 F.3d at 960 (quotation marks and brackets omitted). However, evidence of facially neutral conduct "is not sufficient standing alone; there actually must be race-based [or age-based] discriminatory conduct polluting the environment." *Young v. City of Idabel*, 721 F. App'x 789, 800 (10th Cir. 2018). To survive summary judgment by relying on facially neutral conduct, a plaintiff must introduce evidence of discriminatory conduct such that "a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product

of [racial or age-based] hostility."[18] *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005)

(ellipses and quotation marks omitted).

"While it is generally the jury's role to determine if" harassment is based on the plaintiff's

protected characteristic, "summary judgment is appropriate if the plaintiff has not presented a

triable issue of fact about the defendant's motive." *Throupe*, 988 F.3d at 1251. Thus, for example,

summary judgment is appropriate when a plaintiff's only support for a finding of discriminatory

animus is the plaintiff's own belief. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th

Cir. 1998).

### (b) Analysis of Plaintiff's Hostile Work Environment Claims

The Court has serious reservations about whether all of the employment actions Plaintiff

challenges are part of the same allegedly hostile work environment, *Morgan*, 536 U.S. at 120,

because even though they were all taken by Mr. Nutter, they are of many different types spread

across more than a decade, and for some there is record evidence of only one instance, *i.e.*, being

blamed for a 'failed' project, harassed for not closing tickets, prevented from receiving training,

and having his supervisor duties temporarily revoked. However, even assuming that all of the

challenged actions are part of the same hostile environment, and that they collectively amount to

severe or pervasive harassment, the Court still concludes that Defendant is entitled to summary

judgment on Plaintiff's hostile work environment claims, because Plaintiff points to virtually no

---

[18] "A plaintiff can also state a sufficient [hostile work environment] claim if he presents evidence that the discrimination was motivated by his failure to conform to stereotypical gender norms." *Throupe*, 988 F.3d at 1251-52 (quotation marks omitted). However, as discussed below, even assuming this rule applies to stereotypical norms related to race and age as well as sex, the only evidence Plaintiff has even arguably submitted on this point is his testimony that Mr. Nutter privately addressed him using race-neutral, age-neutral profanity until Plaintiff asked him to stop. And although Plaintiff speculates that Mr. Nutter used this language based on stereotypes about Black people, the only support he offered for this speculation is that Mr. Nutter is married to a Black woman and told stories about meeting Black people in Chicago.

evidence beyond his own belief to show that Mr. Nutter's actions were motivated by Plaintiff's race or age.

Regarding Plaintiff's hostile work environment claim based on race, the record is wholly devoid of any evidence of overtly race-based harassment. Further, though Plaintiff testified to his belief that Mr. Nutter called him profane but racially neutral names because he was stereotyping Plaintiff due to his Black wife and/or Chicago acquaintances, Plaintiff's belief on this point is plainly and wholly speculative. To state the obvious, the fact that Mr. Nutter's wife and Chicago acquaintances are Black is grossly insufficient to show that they used or solicited the kind of profane language to which Plaintiff objected, and Plaintiff has proffered no other evidence tending to show that they did so, or that Mr. Nutter subscribed to such a stereotype. Moreover, Plaintiff admitted that he did not know if Mr. Nutter used this kind of language toward other employees in similar circumstances, and that Mr. Nutter stopped using this kind of language toward him as soon as Plaintiff asked him to.

Regarding Plaintiff's hostile work environment claim based on age, in turn, the record includes evidence of only a single, uncontextualized comment that could arguably refer to Plaintiff's age, *i.e.*, Mr. Nutter's alleged comment that Plaintiff should "retire so they could be happy." (Doc. 85-1 at 22.) But even if the Court were to infer that this comment conveys age-based animus without any idea of the context in which it was uttered, *see Faragalla*, 411 F. App'x at 152-53, an isolated comment like this is simply not enough to show that age-based animus motivated the rest of Mr. Nutter's alleged actions. *Gonzalez*, 2019 WL 4040605 at *5-*6; *see also Holmes*, 176 F.3d 488, at *7 (holding that the plaintiff's "claims of overhearing conversations regarding the possibility of her imminent retirement … are hardly the type of age-discriminatory conduct that meets the threshold requirements for surviving summary judgment").

28

Finally, viewing the record generously in Plaintiff's favor, there is evidence from which a factfinder could infer that Mr. Nutter treated Plaintiff differently from Mr. Martinez, even though they were similarly situated, by: (1) counseling Plaintiff but not Mr. Martinez about the Canteen project; (2) excluding Plaintiff but not Mr. Martinez from two meetings relevant to Plaintiff's work; and, (3) requiring Plaintiff but not Mr. Martinez to close tickets on one occasion. But these alleged incidents of differential treatment are so sparse, viewed in the context of Mr. Nutter's years-long supervision of Plaintiff, that they would not allow a jury to reasonably view all of Mr. Nutter's allegedly harassing acts as the product of racial or age-based hostility, particularly in the absence of any overtly racial or age-based remarks or conduct.[19] *Chavez*, 397 F.3d at 833; *see also Rodriguez v. Brown*, 2022 WL 3453401, at *12 (10th Cir. Aug. 18, 2022) (upholding summary judgment on hostile work environment claims where plaintiff "did not assert any acts taken against her that were overtly because of her [protected characteristics]" and there was therefore "no discriminatory context through which a reasonable jury could infer that any of the neutral acts taken against her were actually because of" those characteristics).

In sum, as a matter of law, a reasonable factfinder viewing the record evidence in context could not find that Plaintiff's race or age played a role in Mr. Nutter's alleged harassment. Because Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact as to whether Defendant subjected him to a hostile work environment because of his race and/or age, the Court will grant Defendant summary judgment on Plaintiff's hostile work environment claims.

---

[19] Nor are these alleged incidents severe or pervasive enough to sustain a hostile work environment claim on their own. *Trujillo*, 157 F.3d at 1213-14.

### C. Plaintiff's Retaliation Claim

In addition to his race and age discrimination claims, Plaintiff alleges that Mr. Nutter

retaliated against him for filing an EEO complaint in March 2019 and a supplemental EEO

complaint in October 2019, in violation of Title VII.[20] (Doc. 45 at 2-3 ¶ 10; *id.* at 7 ¶ 28-31); *see*

42 U.S.C. § 2000e-3. To assess retaliation claims that are not based on direct evidence of retaliatory

animus, the Tenth Circuit uses a modified *McDonell Douglas* framework, in which the plaintiff

bears the initial burden to establish a prima facie case by showing that "(1) [the plaintiff] engaged

in protected opposition to discrimination, (2) a reasonable employee would have considered the

challenged employment action materially adverse, and (3) a causal connection existed between the

protected activity and the materially adverse action." *Daniels*, 701 F.3d at 638. If the plaintiff can

establish a prima facie case, the defendant "must offer a legitimate, non-retaliatory reason for its

employment action," and if the defendant satisfies this burden, the plaintiff "bears the ultimate

burden of demonstrating that [the defendant's] proffered reason is pretextual." *Vaughn v. Epworth*

*Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (brackets and quotation marks omitted).

In his Motion, Defendant raises only one argument in opposition to Plaintiff's retaliation

claims, *i.e.*, that Plaintiff has failed to show a causal connection between his protected activities

and Defendant's alleged employment actions. (Doc. 85 at 20-23.) To establish a causal connection

between a protected activity and an adverse employment action,

> a plaintiff must present evidence of circumstances that justify an inference of
> retaliatory motive. If the protected conduct is closely followed by the adverse
> action, courts have often inferred a causal connection. However, a three-month gap
> between protected activity and an adverse action is too long to support an inference
> of causation on its own. Thus, where a gap of three months or longer has occurred,

---

[20] In his Motion, Defendant states that Plaintiff has asserted retaliation claims under both Title VII and the ADEA.
(Doc. 85 at 20-21.) However, the SAC alleges only that "Defendant retaliated against [Plaintiff] in the terms and
conditions of his employment [in] violation of Title VII for opposing discriminatory practices in the workplace." (Doc.
45 at 7 ¶ 29.)

> a plaintiff must present other evidence—more than mere speculation, conjecture, or surmise—to establish that [the plaintiff's] protected activity was a but-for cause of the adverse employment action.

*Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (quotation marks and citations omitted).

Participating "in any manner in an investigation, proceeding, or hearing under" Title VII is a protected activity for the purposes of establishing a retaliation claim. 42 U.S.C. § 2000e–3(a). *See Vaughn*, 537 F.3d at 1152 (holding that plaintiff engaged in protected activity by submitting materials to supplement her initial EEO complaint). Defendant admits that Plaintiff filed an EEO complaint in March 2019, and that this complaint was amended in October 2019. Thus, the timeframes within which a reasonable factfinder could rely on timing alone to infer a causal connection between Plaintiff's protected activities and Mr. Nutter's actions are: (1) the three months following Plaintiff's filing of an initial EEO complaint, *i.e.*, March 2019 to June 2019; and, (2) the three months following Plaintiff's amendment of that complaint, *i.e.*, October 2019 to January 2020. Outside of these timeframes, Plaintiff would have to present other evidence of a retaliatory motive to show a prima facie case, which he has failed to do.

It is undisputed that nearly all of Mr. Nutter's alleged actions took place outside of the listed timeframes and thus that their timing does not support the inference of a causal connection to Plaintiff's protected activities. Specifically, it is undisputed that the following challenged actions did *not* occur between March and June 2019, or between October 2019 and January 2020: (1) pulling Mr. Martinez off of the Refresh project in or about 2017; (2) downgrading Plaintiff's performance evaluation ratings for 2020 and later years; (3) blaming Plaintiff for the February 2020 Canteen project's staffing issues; (4) revoking Plaintiff's supervisor duties from March to June 2020; (5) counseling Plaintiff about not closing two tickets in or about August 2020; and, (6) leaving Plaintiff off of the August 2023 outage e-mail chain. (*See* Parts I.B, C, D, F, and H, *supra*.)

Further, Plaintiff has failed to present any evidence of when Mr. Nutter criticized, demeaned, and humiliated him, assigned him the ATO project, assigned him a heavy workload generally, left him out of the Golden Age Games and Paulson meetings, left him out of numerous meetings generally, made him go back and close tickets, and prevented him from receiving training, so a reasonable factfinder could not conclude that these actions fell within the operative timeframes, either. (*See* Parts I.A, B, E, F, and G, *supra*.) Having failed to point to any evidence to show that his EEO participation motivated any of the listed conduct, Plaintiff has not demonstrated a genuine issue of material fact as to whether he can establish a prima facie claim of retaliation based on that conduct.

However, a reasonable factfinder *could* infer that Mr. Nutter had a retaliatory motive when he pulled Mr. Martinez off of the Vocera project and gave it to Plaintiff, and downgraded Plaintiff's 2019 performance evaluation. (*See* Parts I.B and C, *supra*.) Tenth Circuit law would allow the factfinder to draw such an inference based on timing alone because there is record evidence that these acts occurred in December 2019, within three months of Plaintiff's protected amendment of his EEO complaint in October 2019. *Bekkem*, 915 F.3d at 1271. The Court will therefore deny Defendant's request for summary judgment on Plaintiff's retaliation claims arising out of these two acts on the sole ground Defendant has raised in his Motion, *i.e.*, the lack of any evidence of a retaliatory motive.

Nevertheless, pursuant to Federal Rule of Civil Procedure 56(f), the Court may grant a motion for summary judgment on grounds not raised by a party after giving notice and a reasonable time to respond. Fed. R. Civ. P. 56(f)(2). And while Defendant failed to argue that the Court should grant him summary judgment on Plaintiff's *retaliation* claims because the challenged actions at issue were not sufficiently adverse and were undertaken for legitimate reasons, Defendant did touch

upon these points persuasively with respect to Plaintiff's *discrimination* claims. (*See, e.g.*, Doc. 85 at 5-7, 14-15, 18.)

Accordingly, the Court notifies the parties that on the present record, it is inclined to grant summary judgment in Defendant's favor on Plaintiff's retaliation claims arising out of Mr. Nutter's assignment of the Vocera project to Plaintiff, and his downgrading of Plaintiff's 2019 performance evaluation rating, on the grounds that: (1) as a matter of law, a reasonable employee would not consider being assigned the Vocera project materially adverse; and, (2) Defendant has proffered legitimate, non-retaliatory reasons for both of these actions and a reasonable juror could not find the proffered reasons pretextual. However, having been notified of the Court's inclination, the parties will be permitted to submit supplemental briefing on these issues pursuant to the schedule set forth below before the Court decides whether to grant summary judgment in Defendant's favor on Plaintiff's remaining retaliation claims.

### III. Conclusion

For the reasons stated herein, Defendant's Summary-Judgment Motion (Opposed) (Doc. 85) is GRANTED IN PART in that all of Plaintiff's race and age discrimination claims based on disparate treatment and hostile work environment, and all of his retaliation claims not arising out of Mr. Nutter's actions in December 2019, as asserted in Plaintiff's Second Amended Complaint for Employment Discrimination on the Basis of Race, Color, Age and Retaliation (Doc. 45), are DISMISSED WITH PREJUDICE.

Additionally, within twenty-one (21) days of entry of this Order, Defendant may submit a supplemental brief addressing whether he is entitled to summary judgment on Plaintiff's remaining retaliation claims on the grounds described in Part II.C, above. Plaintiff may file a response in opposition to Defendant's supplemental brief no later than twenty-one (21) days after Defendant

files his supplemental brief, and Defendant may file a reply within fourteen (14) days after Plaintiff files his response. Defendant's supplemental brief and reply shall comply with the requirements for summary judgment memoranda and replies, respectively, set forth in Local Civil Rule 56.1; and, Plaintiff's response shall comply with the requirements for summary judgment responses set forth in that rule.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent